1  **REICH RADCLIFFE & HOOVER LLP**
   Marc G. Reich (SBN 159936)
2  mgr@reichradcliffe.com
   Adam T. Hoover (SBN 243226)
3  adhoover@reichradcliffe.com
   4675 MacArthur Court, Suite 550
4  Newport Beach, CA 92660
   Phone:  (949) 975-0512
5  Fax: (949) 208-2839

6  **LIFSHITZ LAW PLLC**
   Joshua M. Lifshitz (*Pro Hac Vice to be submitted*)
7  jlifshitz@lifshitzlaw.com
   1190 Broadway
8  Hewlett, NY 11557
   Phone: (516) 493-9780
9  Fax: (516) 280-7376

10  Attorneys for Plaintiff

11                    UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13

14  STEVE SCHNIPPER, Derivatively on Behalf of    Case No: 3:23-cv-01808
    Nominal Defendant TESLA, INC.,

15              Plaintiff,

16  v.                                            **VERIFIED SHAREHOLDER DERIVATIVE
                                                  COMPLAINT**
17  ELON MUSK, ZACHARY KIRKHORN,
    DEEPAK AHUJA, ROBYN M. DENHOLM, IRA           **Demand for Jury Trial**
18  EHRENPREIS, HIRO MIZUNO, JAMES
    MURDOCH, KIMBAL MUSK, KATHLEEN
19  WILSON-THOMPSON, and JOE GEBBIA,

20              Defendants,
    and,

21
    TESLA, INC.,
22
                Nominal Defendant.
23

24

25

26

27

28

By and through his undersigned counsel, Plaintiff Steven Schnipper ("Plaintiff") shareholder derivative action on behalf of Nominal Tesla, Inc. ("Tesla" or the "Company") and against certain current and former officers and directors of the Company for: (i) violations of §10(b) and/or 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder; (ii) breaches of fiduciary duties; (iii) unjust enrichment; and (iv) waste of corporate assets. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Tesla and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Tesla's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action lawsuit captioned *Lamontagne v. Tesla, Inc., et al.*, Case 3:23-cv-00869 (N.D. Cal.) (the "Related Securities Action"); and (e) review of other publicly-available information concerning Tesla and the Defendants.

## NATURE OF THE ACTION

1.      Plaintiff brings this action derivatively for the benefit of Nominal Defendant Tesla against certain of the Company's current executive officers and directors aiming to rectify the Defendants' violations of the Exchange Act and breaches of fiduciary duties for issuing false and misleading statements and/or omitting material information in the Company's public filings and proxy statements from approximately February 19, 2019 to the present (the "Relevant Period").[1]

2.      Tesla designs and manufactures electric vehicles, battery energy storage, solar panels and roof tiles, and related products and services. Tesla is headquartered in Austin, Texas and incorporated in Delaware. The Company's common stock trades on the Nasdaq Stock Market ("NASDAQ") under the ticker symbol "TSLA".

---

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately February 19, 2019 to February 17, 2023; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

3.    In 2014, Tesla announced Tesla Autopilot ("Autopilot"), a suite of purportedly advanced driver-assistance system ("ADAS") features including automated lane-centering, traffic-aware cruise control, lane changes, semi-autonomous navigation, and self-parking. In September 2014, all Tesla cars started shipping with the sensors and software necessary to support the Autopilot system. Since then, the Company has touted refinements and enhancements to the Company's ADAS and Autopilot features, including so-called "Full Self-Driving" ("FSD") software, which purportedly enables Tesla vehicles to drive autonomously to a destination entered in the car's navigation system.

4.    Throughout the Relevant Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects, including that: (i) Defendants had significantly overstated the efficacy, viability, and safety of the Company's Autopilot and FSD technologies; (ii) contrary to Defendants' representations, Tesla's Autopilot and FSD technologies created a serious risk of accident and injury associated with the operation of Tesla vehicles; (iii) all the foregoing subjected Tesla to an increased risk of regulatory and governmental scrutiny and enforcement action, as well as reputational harm; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.    On April 18, 2021, media outlets reported that a Tesla vehicle with "no one" driving it had crashed into a tree, killing two passengers near Houston, Texas in a "fiery" crash. A Harris County Precinct constable told local news station KPRC 2 that the investigation showed "no one was driving" the 2019 Tesla vehicle when the accident occurred.

6.    On this news, Tesla's stock price fell $25.15 per share, or 3.4%, to close at $714.63 per share on April 19, 2021.

7.    On August 16, 2021, media outlets reported that the National Highway Traffic Safety Administration ("NHTSA") had opened a formal investigation into Tesla's Autopilot system after a series of collisions with parked emergency vehicles. The scope of the investigation included 765,000 vehicles, or nearly every vehicle that Tesla has sold in the U.S. since the start of the 2014 model year.

8.    On this news, Tesla's stock price fell $31.00 per share, or 4.32%, to close at $686.17 per share on August 16, 2021.

9.      On June 3, 2022, media outlets reported that NHTSA had issued a formal inquiry to Tesla about the Autopilot and FSD features for certain models of its vehicles after receiving complaints from more than 750 owners of the vehicles about sudden and unexpected braking with no immediate cause.

10.     On this news, Tesla's stock price fell $71.45 per share, or 9.22%, to close at $703.55 per share on June 3, 2022.

11.     On January 27, 2023, media outlets reported that the SEC was investigating statements made by Tesla and its Chief Executive Officer ("CEO"), Defendant Elon R. Musk ("Musk"), concerning the Autopilot system, including whether Musk made inappropriate forward-looking statements regarding the Autopilot system.

12.     On this news, Tesla's stock price fell $11.24 per share, or 6.32%, to close at $166.66 per share on January 30, 2023.

13.     On February 16, 2023, media outlets reported that NHTSA had ordered a recall of nearly 363,000 Tesla vehicles equipped with the Company's FSD "Beta" software, stating that the software may allow the equipped vehicles to act "in an unlawful or unpredictable manner," increasing the risk of a crash.

14.     On this news, Tesla's stock price fell $12.20 per share, or 5.69%, to close at $202.04 per share on February 16, 2023.

15.     Then, on February 18, 2023, media outlets reported that a Tesla vehicle had crashed into a fire truck that was responding to an earlier accident, killing the driver and injuring a passenger and four firefighters. News reports linked the crash with prior reports of Tesla vehicles crashing into stationary emergency vehicles as a consequence of poorly performing ADAS technologies, increasing market and public concerns regarding the Autopilot system in Tesla's vehicles.

16.     On this news, Tesla's stock price fell $10.94 per share, or 5.25%, to close at $197.37 per share on February 21, 2023, the next trading day.

17.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, the Company has suffered significant damage.

1

**JURISDICTION AND VENUE**

2     18.     This Court has jurisdiction over this action pursuant to the subject matter of this action

3   pursuant to 28 U.S.C. § 1331 because the claims arise under and pursuant to §10(b) of the Exchange

4   Act and Rule 10(b)-5 promulgated thereunder.

5     19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28

6   U.S.C. §1367(a), as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

7     20.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), because a substantial

8   portion of the transactions and wrongs complained of herein occurred in this District and defendants

9   have received substantial compensation within this District by doing business here and engaging in

10   numerous activities that had an effect in this jurisdiction.

11

**THE PARTIES**

12     21.     Plaintiff has been a shareholder during the Relevant Period and has continuously held

13   shares of Tesla common stock to present.

14     22.     Nominal Defendant Tesla is incorporated in Delaware and its current principal

15   executive offices are located at 1 Tesla Road, Austin, Texas 78725. The Company's common stock

16   trades on the NASDAQ under the symbol "TSLA."

17     23.     Defendant Musk has been the Company's CEO since October 2008 and a member of the

18   Board since April 2004. For the fiscal year of 2019, Defendant Musk received $23,760 in total

19   compensation. Defendant Musk is named as a defendant in the Related Securities Action.

20     24.     Defendant Zachary J. Kirkhorn ("Kirkhorn") has been the Company's Chief Financial

21   Officer ("CFO") since March 2019. For the fiscal years of 2021, 2022, and 2023, Defendant Kirkhorn

22   received $21,243,957, $46,562,116, and $301,154 in total compensation, respectively. Defendant

23   Kirkhorn is named as a defendant in the Related Securities Action.

24     25.     Defendant Deepak Ahuja ("Ahuja") served as the Company's CFO from July 2008 to

25   November 2015, and again from March 2017 until March 2019. For the fiscal years of 2017, 2018,

26   and 2019, Defendant Ahuja received $15,498,009, $6,210,353, and $176,870 in total compensation,

27   respectively. Defendant Ahuja is named as a defendant in the Related Securities Action.

28

26.     Defendants Musk, Kirkhorn, and Ahuja are collectively referred to herein as the "Securities Action Defendants."

27.     Defendant Robyn M. Denholm ("Denholm") has been a member of the Company's Board since August 2014. In addition, Defendant Denholm has been Chairman of the Board ("the Board") since November 2018. Defendant Denholm is Chair of the Audit Committee and Chair of the Disclosure Controls Committee. Defendant Denholm is also a member of the Compensation Committee and the Nominating and Governance Committee.

28.     Defendant Ira Ehrenpreis ("Ehrenpreis") has been a member of the Company's Board since May 2007. Defendant Ehrenpreis is Chair of the Compensation Committee and the Nominating and Governance Committee.

29.     Defendant Hiro Mizuno ("Mizuno") has been a member of the Company's Board since April 2020. Defendant Mizuno is a member of the Audit Committee.

30.     Defendant James Murdoch ("Murdoch") has been a member of the Company's Board since July 2017. Defendant Murdoch is a member of the Audit Committee, Disclosure Controls Committee, and the Nominating and Governance Committee.

31.     Defendant Kimbal Musk ("K. Musk") has been a member of the Company's Board since April 2004.

32.     Defendant Kathleen Wilson-Thompson ("Wilson-Thompson") has been a member of the Company's Board since December 2018. Defendant Wilson-Thompson is a member of the Audit Committee, Disclosure Controls Committee, and the Nominating and Governance Committee.

33.     Defendant Joe Gebbia ("Gebbia") has been a member of the Company's Board since September 2022.

34.     Defendants Denholm, Ehrenpreis, Mizuno, Murdoch, K. Musk, Wilson-Thompson, and Gebbia are collectively referred to herein as the "Director Defendants.

35.     The Director Defendants, along with the Securities Action Defendants are referred to herein collectively as the "Individual Defendants."

36.     Defendant Tesla, along with the Individual Defendants are referred to herein collectively as the "Defendants."

**FIDUCIARY DUTIES ON THE INDIVIDUAL DEFENDANTS**

37.    By reason of their positions as officers, directors, and/or fiduciaries of Tesla, and because of their ability to control the business and corporate affairs of Tesla, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Tesla in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Tesla and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

38.    Each director and officer of the Company owes to Tesla and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

39.    In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

**Duties of the Members of the Audit Committee**

40.    Pursuant to the Audit Committee Charter of Tesla (modified as of December 2021),[2] the purpose of the Audit Committee is to:

- Provide oversight of the Company's accounting and financial reporting processes and the audit of the Company's financial statements;

- Assist the Board in oversight of

    i.   the integrity of the Company's financial statements,
    ii.  the Company's compliance with legal and regulatory requirements,
    iii. the independent auditor's qualifications, independence and performance,
    iv.  the organization and performance of the Company's internal audit function,
    v.   the Company's internal accounting and financial controls,

---

[2] Available at https://tesla-cdn.thron.com/static/9RTFDY_Audit_Committee_Charter__website_1_YCEBQB.pdf?xseo=&response-content-disposition=inline%3Bfilename%3D%22Audit%2BCommittee%2BCharter%2B%28website%291.pdf%22.

vi.   the Company's treasury and finance matters, and

vii.   the Company's risk management, including data privacy and security[.]

41.   The responsibilities of the Audit Committee include the following, among others:

**Review Procedures**

- Reviewing the reports of management, internal audit and the independent auditors concerning the design, implementation and maintenance of the Company's internal controls and procedures for financial reporting, including meeting periodically with the Company's management, internal audit and the independent auditors to review their assessment of the adequacy of such controls and to review, before release, the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and the attestations or reports by the independent auditors relating to such disclosure;

- Reviewing and providing oversight of the external audit by (i) reviewing the independent auditors' proposed audit scope and approach; (ii) discussing with the Company's independent auditors the financial statements and audit findings, including any significant adjustments, management judgments and accounting estimates, significant new accounting policies, disagreements with management and any other required communications described in applicable accounting standards; (iii) reviewing with the independent auditors the Company's critical accounting policies and practices, alternative treatments of financial information within generally accepted accounting principles that have been discussed with management and the treatment recommended by the independent auditors and other material written communications between the independent auditors and management and (iv) reviewing reports submitted to the Committee by the independent auditors in accordance with applicable SEC requirements;

- Reviewing and approving the annual internal audit project plan and any proposed changes and reviewing periodic reports summarizing results of the internal audit projects;

- Reviewing and discussing with management earnings releases (with particular attention to any use of "pro forma" or "adjusted" non-GAAP information), financial information and earnings guidance provided to the public, analysts and ratings agencies;

- Reviewing and discussing with management and the independent auditors the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing the Company's annual report on Form 10-K and quarterly reports on Form 10-Q, respectively, with the SEC;

- Recommending to the Board, if deemed appropriate, that the audited financial statements be included in the Company's annual report on Form 10-K, in accordance with the rules and regulations of the SEC;

- Directing the Company's independent auditors to review before filing with the SEC, the Company's interim financial statements included in quarterly reports on Form 10-Q, using professional standards and procedures for conducting such reviews;

- Conducting a post-audit review of the financial statements and audit findings, including any suggestions for improvements provided to management by internal audit or the independent auditors and management's response to such suggestions;

- Reviewing, prior to announcement, Company press releases and other disclosures containing financial information for the purpose of ensuring that such press releases and other disclosures properly disclose financial information presented in accordance with GAAP and, to the extent non-GAAP information is included, adequately disclose how such non-GAAP information differs from the comparable GAAP information and ensure that disclosure of such non-GAAP information is not given undue prominence and that such non-GAAP information does not provide a misleading presentation of the Company's results of operations or financial condition;

- Discussing guidelines and policies with respect to risk assessment and risk management with the Company's management and overseeing financial risk exposures, including monitoring the Company's financial condition and investments, the integrity of the Company's financial statements, accounting matters, internal controls over financial reporting, the independence of the Company's independent auditor and guidelines and policies with respect to risk assessment and risk management;

- Overseeing the Company's annual enterprise business risk assessment, which is conducted by the internal audit function and which includes review of the primary risks facing the Company and the Company's associated risk mitigation measures;

- Reviewing and approving in advance when possible, or ratifying as soon as reasonably practicable, any related person transactions;

- Reviewing, in conjunction with counsel, any legal matters that could have a significant impact on the Company's financial statements;

- Reviewing insurance coverage;

- Investigating, or authorizing on its behalf an investigation of, any matter relating to any purpose, responsibility, duty, or power of the Committee set forth in this charter or applicable law, or delegated to the Committee by the Board, and

obtaining unrestricted access to the Company's books, records and employees in furtherance of any such investigation;

- Reviewing and recommending changes if appropriate to the Board with respect to its own charter, structure, membership requirements and processes on an annual basis;

**Independent Auditors**

- Having sole authority over appointing, compensating, overseeing (including resolving disagreements between management and the independent auditors regarding financial reporting and internal controls over financial reporting), and where appropriate, replacing, the independent auditors whose purpose is preparing or issuing an audit report or related work;

- Overseeing and, at least annually, evaluating the work of the independent auditor or any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company, which evaluation shall include a review and evaluation of the experience, qualifications and independence of the lead partners and senior members of the independent auditor team and taking into account the opinions of management and the internal audit function, if applicable;

- Overseeing the rotation of the audit partners of the Company's independent auditors as required by the Sarbanes-Oxley Act and other applicable standards and SEC requirements;

- Reviewing and approving the Company's hiring of current or former senior employees of the independent auditor who were part of the Company's account, if any;

- Reviewing the independence of the outside auditors, including (i) obtaining on a periodic basis a written statement from the independent auditors regarding relationships and services with the Company that may impact independence, as defined by applicable standards and SEC requirements, and discussing with the independent auditors their independence, (ii) presenting this statement to the Board and (iii) to the extent there are relationships, monitoring and investigating them;

- Receiving and reviewing annually a report by the independent auditors describing the firm's internal quality-control procedures, any material issues raised by the most recent internal quality-control review, peer review, or PCAOB review, of the independent auditing firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; and any other required reports from the independent registered public accounting firm;

- Reviewing and discussing with the independent auditors the written independence disclosures required by the applicable requirements of the PCAOB or other regulatory body;

- Pre-approving (i) the scope and plans for the audits and audit fees and (ii) permissible non-audit and tax services provided to the Company by the independent auditors, except where pre-approval is not required because such non-audit services are de minimis under the rules of the SEC, in which case subsequent approval may be obtained. The Committee may delegate to one or more designated members of the Committee the authority to pre-approve audit and permissible non-audit services, provided such pre-approval decision is presented to the full Committee at its scheduled meetings;

- Reviewing any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles;

- Reviewing the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company;

- Reviewing and discussing the assessment of the Company's annual Impact Report and, as deemed appropriate, other ESG-related disclosures;

**Internal Audit**

- Reviewing and approving the selection of the Company's internal auditor;

- Reviewing the activities, organizational structure and qualifications of the internal audit function;

- Reviewing and approving changes to the internal audit charter;

- Reviewing periodically with the Company's internal auditor any issues encountered in the course of the internal audit function's work;

*      *      *

**Regulatory Compliance and Other Matters**

- Overseeing compliance with the requirements of the SEC for disclosure of auditor's services and audit committee members, member qualifications and activities;

- Reviewing management's monitoring of compliance with the US Foreign Corrupt Practices Act and any other similar applicable regulations;

- Providing a report for inclusion in the Company's proxy statement in accordance with the rules and regulations of the SEC;

- Establishing procedures for receiving, retaining and treating complaints received by the Company regarding accounting, internal accounting controls or auditing matters and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters; and

- Reviewing and discussing with management the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs.

The independent auditors shall report directly to the Committee. In addition, the Committee may retain, as appropriate and at the Company's expense, outside legal, accounting or other advisors to advise or assist the Committee in the performance of any of the responsibilities and duties set forth above, and terminate such engagements as the Committee may deem necessary.

42.     Upon information and belief, the Company maintained versions of the Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the members of the Company's Audit Committee.

**Duties of the Members of the Disclosure Controls Committee Charter**

43.     Pursuant to the Disclosure Controls Committee Charter of Tesla (amended as of August 2022)[3], the purpose of the Disclosure Controls Committee is to "implement, review and monitor the Company's compliance with the specific responsibilities and duties listed below, to exercise the powers listed below and to perform such other duties as the Board may from time to time prescribe."

44.     The responsibilities of the Disclosure Controls Committee include the following, among others:

- Overseeing the implementation of the terms of the consent agreement between the United States Securities and Exchange Commission and the Company dated September 29, 2018, along with the final judgment incorporated therein, the "Consent";

- Reviewing compliance with the terms of the Consent and any matter relating to any purpose, responsibility, duty or power of the Committee set forth in this charter or applicable law, or delegated to the Committee by the Board, and obtaining unrestricted access to the Company's books, records and employees in furtherance of any such review;

---

[3] Available at https://tesla-cdn.thron.com/static/OVKBAU_Disclosure_Controls_Committee_Charter_JVELTO.pdf?xseo=&response-content-disposition=inline%3Bfilename%3D%22Disclosure%2BControls%2BCommittee%2BCharter.pdf%22.

- Overseeing the controls and processes governing the Company's and its senior executives' disclosures and/or public statements that relate to the Company, as set forth in the Senior Executive Communications Policy;

- Overseeing the review and resolution, by the appropriate committee of the Board, as applicable, of human resources issues or issues raising conflicts of interest that involve any member of executive management;

- Ratifying the employment or designation of an experienced securities law attorney of the Company as Disclosure Counsel who will provide legal advice concerning (i) disclosures and compliance relating to the Company by the Company and its executive officers pursuant to the Company's Senior Executives Communications Policy and, if necessary, other applicable policies and procedures and (ii) securities law issues, including, but not limited to, compliance with federal securities laws and regulations; and

- Periodically reviewing and, if appropriate, recommending to the full Board amendment of the Committee's charter and processes.

In performing its duties, the Committee shall have the authority, at the Company's expense, to retain, hire and obtain advice, reports or opinions from external legal counsel, search firms and expert advisors to assist with the execution of the Committee's duties and responsibilities as set forth in this charter, applicable law or the Consent, or delegated to the Committee by the Board.

45.    Upon information and belief, the Company maintained versions of the Disclosure Controls Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Company's Disclose Controls Committee.

**Duties Pursuant to the Company's Code of Business Ethics**

46.    The Individual Defendants, as officers and/or directors of Tesla, were also bound by the Company's Code of Business Ethics (the "Code")[4] which, according to the Code, sets out guiding principles to all directors, officers, and employees of Tesla, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

47.    Regarding basic general principles of conduct, the Code states that:

---

[4] Available at https://tesla-cdn.thron.com/static/XT8QBQ_business-code-of-ethics_SHJXZD .pdf?xseo=&response-content-disposition=inline%3Bfilename%3D%22business-code-of-ethics.pdf%22.

Tesla always strives to conduct business with integrity and in compliance with all laws and regulations where we operate. This applies to every business decision in every area of the company.

We achieve this through our guiding principles:

**We Think Before We Act**
Demonstrating trust in day-to-day work.

**We Treat Everyone with Respect**
Creating and maintaining a respectful and inclusive workplace.

**We Protect Tesla Information and Assets**
Upholding responsible data handling practices and transparency.

**We Do Business with Integrity**
Doing the right thing, no matter who is watching and even when it's hard.

48.    Regarding disclosures and retention of the Company's business and financial records, the Code states:

**Accurate Recordkeeping**

Each of us is responsible for keeping complete, clear, and accurate records related to our work at Tesla. We cannot make good decisions with bad data. You should obviously never falsify any record or report. Speak up to your manager or through the Integrity Line if you see information that is inaccurate or incomplete. Ensure that corrections are made. No one should ever put pressure on others to shade the truth. Our records, and how we maintain them, are a sign of Tesla's health to the outside world. As a public company, Tesla has a legal obligation to report accurate financial results. Immediately report any concerns regarding the accuracy of financial records or failures of our internal controls to Compliance, Internal Audit, or through the Integrity Line. You should follow Tesla's Records Retention Policy to ensure that records are kept in the right way and for the right amount of time. Finally, as a Tesla employee, you must fully cooperate with any audits or investigations over your area of responsibility.

49.    Upon information and belief, the Company maintained versions of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar duties on, among others, the Individual Defendants, as those set forth above.

**Control, Access, and Authority**

50.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Tesla, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Tesla.

51.     Because of their advisory, executive, managerial, and directorial positions with Tesla, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Tesla.

52.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Tesla and was at all times acting within the course and scope of such agency.

## Reasonable and Prudent Supervision

53.     To discharge their duties, the officers and directors of Tesla were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Tesla were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how Tesla conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that Tesla was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**BREACHES OF DUTIES**

54.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to Tesla and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Tesla, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Tesla, the absence of good faith on their part, and a reckless disregard for their duties to Tesla and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Tesla.

55.     The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

56.     In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Related Securities Action that alleges violations of the federal securities laws. As a result, Tesla has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

57.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

58.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

59.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, unjust enrichment, and waste of corporate assets; and (b) disguise and misrepresent the Company's actual business and financial prospects.

60.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

61.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

62.     Tesla designs and manufactures electric vehicles, battery energy storage, solar panels and roof tiles, and related products and services.

63.     In 2014, Tesla announced Tesla Autopilot, a suite of purported ADAS features including automated lane-centering, traffic-aware cruise control, lane changes, semi-autonomous navigation, and self-parking. In September 2014, all Tesla cars started shipping with the sensors and software necessary to support the Autopilot system. Since then, the Company has touted refinements and enhancements to the Company's ADAS and Autopilot features, including its FSD software, which purportedly enables Tesla vehicles to drive autonomously to a destination entered in the car's navigation system.

64.     The Relevant Period begins on February 19, 2019, when Tesla filed an annual report on Form 10-K with the SEC during pre-market hours, reporting the Company's financial and operational results for the quarter and year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K

contained the following representations regarding the purported safety-enhancing features and

capabilities of Tesla's Autopilot technology, as well as advancements in the development of the same:

> ### Self-Driving Development
>
> We have expertise in developing self-driving systems, and currently offer in our vehicles an advanced driver assist system that we refer to as Autopilot, including auto-steering, traffic aware cruise control, automated lane changing, automated parking, Summon and driver warning systems. In October 2016, we began equipping all Tesla vehicles with hardware needed for full self-driving capability, including cameras that provide 360 degree visibility, updated ultrasonic sensors for object detection, a forward-facing radar with enhanced processing, and a powerful new onboard computer. Our Autopilot systems relieve our drivers of the most tedious and potentially dangerous aspects of road travel. Although, at present, the driver is ultimately responsible for controlling the vehicle, our system provides safety and convenience functionality that allows our customers to rely on it much like the system that airplane pilots use when conditions permit. This hardware suite, along with over-the-air firmware updates and field data feedback loops from the onboard camera, radar, ultrasonics, and GPS, enables the system to continually learn and improve its performance.
>
> Additionally, we continue to make significant advancements in the development of fully self-driving technologies.

(Emphasis in original).

65.     The 2018 10-K also repeatedly referenced the purported "high performance" of the

Autopilot system, including its "active safety and convenience features[.]"

66.     In addition, the 2018 10-K purported to warn that Tesla "*may* become subject to product

liability claims" (emphasis added) regarding, *inter alia*, the Company's Autopilot technology, while

simultaneously downplaying such risks and touting the purported safety of the Company's vehicles,

stating, in relevant part:

> ***Although we design our vehicles to be the safest vehicles on the road***, product liability claims, even those without merit, could harm our business, prospects, operating results and financial condition. The automobile industry in particular experiences significant product liability claims and we face inherent risk of exposure to claims in the event our vehicles do not perform or are claimed to not have performed as expected. As is true for other automakers, our cars have been involved and we expect in the future will be involved in crashes resulting in death or personal injury, and such crashes where Autopilot is engaged are the subject of significant public attention. We have experienced and we expect to continue to face claims arising from or related to misuse or claimed failures of new technologies that we are pioneering, including Autopilot in our vehicles . . . . A successful product liability claim against us could require us to pay a substantial

monetary award. Our risks in this area are particularly pronounced given the relatively limited number of vehicles and energy storage products delivered to date and limited field experience of our products. Moreover, a product liability claim could generate substantial negative publicity about our products and business and could have a material adverse effect on our brand, business, prospects and operating results.

(Emphasis added).

67.     Appended as an exhibit to the 2018 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Musk and Ahuja "certif[ied], pursuant to 18 U.S.C. Section 1350, that, to [their] knowledge, the [2018 10-K] (i) fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] and (ii) that the information contained in [the 2018 10-K] fairly presents, in all material respects, the financial condition and results of operations of Tesla, Inc."

68.     On April 3, 2019, Tesla issued a press release stating that "Tesla is making significant progress in the development of its autonomous driving software and hardware, including our FSD computer, which is currently in production and which will enable full-self driving via future over-the-air software updates."

69.     On April 14, 2019, hyping the viability of Tesla's Autopilot technology, Defendant Musk tweeted that "[b]uying a car in 2019 that can't upgrade to full self-driving is like buying a horse instead of a car in 1919."

70.     Likewise, on April 22, 2019, Defendant Musk posted a nearly four-hour video under the caption "Tesla Full Self-Driving," which depicted footage of Tesla cars purportedly driving autonomously, as well as Musk and other Tesla executives discussing at length the various features of the Autopilot system, at a "Tesla Autonomy Day" event.

71.     On February 2, 2020, Defendant Musk tweeted that "Tesla will soon have over a million connected vehicles worldwide with sensors & compute needed for full self-driving, which is orders of magnitude more than everyone else combined, giving you the best possible dataset to work with," thereby endorsing the viability of the Autopilot system's technology.

72.     On February 13, 2020, Tesla filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2019 (the "2019 10-K"). The 2019 10-K contained the following representations regarding the

purported safety-enhancing features and capabilities of Tesla's Autopilot and FSD technologies, as well as advancements in the development of the same:

### Self-Driving Development

We have expertise in developing technologies, systems and software to achieve self-driving vehicles. We are equipping all new Tesla vehicles with hardware needed for full self-driving in the future, including a new powerful and proprietary on-board computer that we introduced in 2019. This hardware suite enables field data from the on-board camera, radar, ultrasonics, and GPS to continually train and improve our neural network for real-world performance.

Currently, we offer in our vehicles certain advanced driver assist systems under our Autopilot and FSD options, including auto-steering, traffic aware cruise control, automated lane changing, automated parking, driver warning systems, and a Smart Summon feature that enables vehicles to be remotely summoned over short distances in parking lots and driveways. These systems relieve our drivers of the most tedious and potentially dangerous aspects of road travel, and the field data feedback loops from the on-board hardware, as well as over-the-air firmware updates, allow us to improve them over time. Although at present the driver is ultimately responsible for controlling the vehicle, our systems provide safety and convenience functionality that allows our customers to rely on them much like the system that airplane pilots use when conditions permit.

(Emphasis in original).

73.    Similarly, the 2019 10-K represented that, "[c]ombined with technical advancements in our [*inter alia*] . . . Autopilot and [FSD] hardware . . . , our electric vehicles boast advantages such as . . . superior acceleration, handling and safety characteristics"; and that "[w]e believe that a key factor in our success will be our Autopilot and FSD technologies that currently enable the driver-assistance features in our vehicles, and in which we are making significant strides through our proprietary and powerful FSD computer and remotely updateable artificial intelligence software."

74.    The 2019 10-K also contained substantively the same generic, boilerplate provision as referenced above, regarding the risk that Tesla "*may*" be subjected to product liability claims regarding, among other things, the Company's Autopilot and FSD technologies, while simultaneously downplaying that risk and touting that "we design our vehicles to be the safest vehicles on the road[.]"

75.    Appended as an exhibit to the 2019 10-K were substantively the same SOX certifications as referenced above, signed by Defendants Musk and Kirkhorn.

76.   On February 8, 2021, Tesla filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2020 (the "2020 10-K"). The 2020 10-K contained the following representations regarding the purported safety-enhancing features and capabilities of Tesla's Autopilot and FSD technologies, as well as advancements in the development of the same:

### Self-Driving Development

We have expertise in developing technologies, systems and software to enable self-driving vehicles using primarily vision and radar-based sensors. Our FSD Computer runs our neural networks in our vehicles, and we are also developing additional computer hardware to better enable the massive amounts of field data captured by our vehicles to continually train and improve these neural networks for real-world performance.

Currently, we offer in our vehicles certain advanced driver assist systems under our Autopilot and FSD options. Although at present the driver is ultimately responsible for controlling the vehicle, our systems provide safety and convenience functionality that relieves drivers of the most tedious and potentially dangerous aspects of road travel much like the system that airplane pilots use, when conditions permit. As with other vehicle systems, we improve these functions in our vehicles over time through over-the-air updates.

We intend to establish in the future an autonomous Tesla ride-hailing network, which we expect would also allow us to access a new customer base even as modes of transportation evolve.

(Emphasis in original).

77.   The 2020 10-K also contained substantively the same generic, boilerplate provision as referenced above, regarding the risk that Tesla "*may*" be subjected to product liability claims regarding, among other things, the Company's Autopilot and FSD technologies, while simultaneously downplaying that risk.

78.   Appended as an exhibit to the 2020 10-K were substantively the same SOX certifications as referenced above, signed by Defendants Musk and Kirkhorn.

79.   The statements referenced above were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants had significantly overstated

the efficacy, viability, and safety of the Company's Autopilot and FSD technologies; (ii) contrary to Defendants' representations, Tesla's Autopilot and FSD technologies created a serious risk of accident and injury associated with the operation of Tesla vehicles; (iii) all the foregoing subjected Tesla to an increased risk of regulatory and governmental scrutiny and enforcement action, as well as reputational harm; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

80.   On Sunday, April 18, 2021, media outlets reported that a Tesla vehicle with "no one" driving it had crashed into a tree, killing two passengers near Houston, Texas in a "fiery" crash. For example, local Houston, Texas news station KPRC 2 published an article that day reporting, in relevant part:

> A Memorial Hermann doctor has been identified as one of two men killed when the Tesla they were in crashed into a tree. The accident has made national headlines because *local officials investigating the accident say no one was driving the vehicle*.

> \*   \*   \*

> Harris County Precinct 4 Constable Mark Herman told KPRC 2 that the investigation showed *"no one was driving"* the fully electric 2019 Tesla when the accident happened. *There was a person in the passenger seat of the front of the car and in the rear passenger seat of the car.*

> \*   \*   \*

> Constable Herman said authorities believe no one else was in the car and that it burst into flames immediately. He said he believes *it wasn't being driven by a human.*

> Harris County Constable Precinct 4 deputies said the vehicle was traveling at a high speed when it *failed to negotiate a cul-de-sac turn*, ran off the road and hit the tree.

(Emphases added).

81.   The same KRPC 2 article also quoted the following statement received from NHTSA regarding the incident:

> NHTSA is aware of the tragic crash involving a Tesla vehicle outside of Houston, Texas. NHTSA has immediately launched a Special Crash Investigation team to investigate the crash. We are actively engaged with local law enforcement and Tesla to learn more about the details of the crash and will take appropriate steps when we have more information.

82.    On this news, Tesla's stock price fell $25.15 per share, or 3.4%, to close at $714.63 per share on April 19, 2021.

83.    Then, on August 16, 2021, during pre-market hours, media outlets reported that NHTSA had opened a formal investigation into Tesla's Autopilot system after a series of collisions with parked emergency vehicles. For example, an article published by *Forbes* that day stated, in relevant part:

> ***U.S. regulators have opened up the biggest review of Tesla's Autopilot since the driving-assistance feature was introduced, centered around a string of collisions with emergency vehicles that resulted in numerous injuries and at least one fatality.***
>
> The [NHTSA] says its Office of Defect Investigations opened the review on August 13 to look into 11 crashes involving Teslas hitting vehicles at "first responder scenes." An estimated 765,000 vehicles produced between 2014 and 2021 and including every model in Tesla's lineup-the Model S, X, 3 and Y-are covered in the investigation.
>
> It will "assess the technologies and methods used to monitor, assist and enforce the driver's engagement with the dynamic driving task during Autopilot operation," NHTSA said. The investigation will assess the effectiveness of the system's "Object and Event Detection and Response" and circumstances under which Autopilot is designed to be functional.
>
> *        *        *
>
> The investigation is the biggest in company history and comes as Tesla expands availability of its so-called [FSD] feature, which the company has told California regulators isn't actually autonomous driving technology. NHTSA in January 2017 concluded an investigation into a Model S crash in Florida that killed the vehicle's owner who was using Autopilot at the time without finding the company at fault. The family of a Model X driver who was killed in a Silicon Valley crash while using the system sued Tesla in May 2019 saying the technology is defective.
>
> Since the system was introduced seven years ago, safety advocates have raised concerns that the Autopilot name suggests the driver-assistance feature can lead many users to place too much confidence in it. That's been born out by numerous Tesla owners posting videos over the years treating Autopilot as an autonomous system, with some sleeping at the wheel or even sitting in the back seat while traveling down the highway.

(Emphasis added).

84.    On this news, Tesla's stock price fell $31.00 per share, or 4.32%, to close at $686.17 per share on August 16, 2021. Despite the declines in Tesla's stock price on April 19 and August 16, 2021, the Company's common stock continued to trade at artificially inflated prices throughout the

remainder of the Relevant Period because of Defendants' continued misstatements and omissions regarding Tesla's Autopilot and FSD technologies.

85. For example, on February 7, 2022, Tesla filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2021 (the "2021 10-K"). That filing contained substantively the same statements as referenced above, regarding the purported safety-enhancing features and capabilities of Tesla's Autopilot and FSD technologies, as well as advancements in the development of the same.

86. In addition, the 2021 10-K contained substantively the same generic, boilerplate provision as referenced above, regarding the risk that Tesla "*may*" be subjected to product liability claims regarding, among other things, the Company's Autopilot and FSD technologies, while simultaneously downplaying that risk.

87. Appended as an exhibit to the 2021 10-K were substantively the same SOX certifications as referenced above, signed by Defendants Musk and Kirkhorn.

88. The statements referenced above were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants had significantly overstated the efficacy, viability, and safety of the Company's Autopilot and FSD technologies; (ii) contrary to Defendants' representations, Tesla's Autopilot and FSD technologies created a serious risk of accident and injury associated with the operation of Tesla vehicles; (iii) all the foregoing subjected Tesla to an increased risk of regulatory and governmental scrutiny and enforcement action, as well as reputational harm; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

89. On June 3, 2022, during pre-market hours, media outlets reported that NHTSA had issued a formal inquiry to Tesla about the Autopilot and FSD features for certain models of its vehicles after receiving complaints from more than 750 owners of the vehicles about sudden and unexpected braking with no immediate cause. For example, an article published by *Street Insider* that day stated, in relevant part:

US authorities have received 758 complaints concerning Tesla . . . vehicles unexpectedly braking. The electric vehicle manufacturer must respond to the issue by June 20th. Tesla has issued several recalls this year. However, the latest complaint count to the [NHTSA] has more than doubled since February.

The NHTSA revealed the number of complaints in a 14-page letter to the company asking the automaker for all consumer and field reports it has received about false braking, as well as reports of crashes, injuries, deaths and property damage claims. It also asks whether the company's "Full Self Driving" and automatic emergency braking systems were active at the time of any incident.

***In opening the probe, the agency said it was looking into vehicles equipped with automated driver-assist features such as adaptive cruise control and "Autopilot," which allows them to automatically brake and steer within their lanes.***

"Complainants report that the rapid deceleration can occur without warning, and often repeatedly during a single drive cycle," the agency says.

(Emphasis added).

90.    On this news, Tesla's stock price fell $71.45 per share, or 9.22%, to close at $703.55 per share on June 3, 2022. Despite this decline in Tesla's stock price, the Company's common stock continued to trade at artificially inflated prices throughout the remainder of the Relevant Period because of Defendants' continued misstatements and omissions regarding Tesla's Autopilot and FSD technologies.

91.    For example, on August 18, 2022, Defendant Musk tweeted, in relevant part, that "side mirrors won't be needed in a self-driving future", thereby once again endorsing the viability of the Autopilot system's technology and FSD Beta software and suggesting that the Company's ADAS technologies obviated the need for basic, common-sense safety practices (*e.g.*, checking a vehicle's mirrors).

92.    The statement referenced above was materially false and misleading because Defendants failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the statement was false and/or misleading and/or failed to disclose that: (i) Defendants had significantly overstated the efficacy, viability, and safety of the Company's Autopilot and FSD technologies; (ii) contrary to Defendants' representations, Tesla's Autopilot and FSD technologies created a serious risk of accident and injury associated with the operation of Tesla vehicles; (iii) all the foregoing subjected Tesla to an increased risk of regulatory and governmental scrutiny and

enforcement action, as well as reputational harm; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

93.    On January 27, 2023, during after-market hours, media outlets reported that the SEC was investigating statements made by Tesla and Defendant Musk concerning the Autopilot system, including whether Musk made inappropriate forward-looking statements regarding the Autopilot system. For example, an article published by *Bloomberg News* that day stated, in relevant part:

> US regulators are investigating Elon Musk's role in shaping Tesla Inc.'s self- driving car claims, the latest effort by watchdogs to scrutinize the actions of the world's second-richest person.
>
> The review is part of an ongoing [SEC] probe of the company's statements about its Autopilot driver-assistance system, according to a person with knowledge of the matter who asked not to be identified discussing aspects of the investigation that haven't been disclosed.
>
> As Tesla's [CEO], the veracity of Musk's comments carry particular heft under the agency's rules. The SEC declined to comment. Musk and his attorney Alex Spiro didn't respond to requests for comment.
>
> Musk is already clashing with the SEC on several fronts. But the regulator's Autopilot review directly touches on a business priority that Musk has singled out as crucial to Tesla's future.
>
> ***SEC officials are weighing whether Musk may have inappropriately made forward-looking statements, said the person. An investigation by the agency's enforcement unit doesn't always lead to consequences, but can result in lawsuits, fines or other civil penalties for companies and executives.***
>
> It couldn't be determined specifically which of Musk's statements or activities about Autopilot have garnered the attention of the SEC.
>
> Tesla's driver-assistance technology has for years been a focus of Musk. He personally directed the creation of a 2016 video that may have exaggerated the technology's capabilities. ***The video's promises of eventual fully autonomous, hands-free driving functionality have yet to materialize.***
>
> In a behind-the-scenes glimpse into Musk's thinking about the Autopilot video, he told Tesla staff in internal emails in 2016, "I will be telling the world that this is what the car *will* be able to do." Musk continued, "not that it can do this upon receipt."
>
> Tesla beats out its competitors on self-driving vehicles because "the car is upgradeable to autonomy," Musk said during a Twitter Spaces conversation in December. "That's something that no other car company can do," he added.

(Emphases added).

94.    On this news, Tesla's stock price fell $11.24 per share, or 6.32%, to close at $166.66 per share on January 30, 2023, the next trading day. Despite this decline in Tesla's stock price, the Company's common stock continued to trade at artificially inflated prices throughout the remainder of the Relevant Period because of Defendants' continued misstatements and omissions regarding Tesla's Autopilot and FSD technologies.

95.    For example, on January 31, 2023, Tesla filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2022 (the "2022 10-K"). That filing contained substantively the same statements as referenced above, regarding the purported safety-enhancing features and capabilities of Tesla's Autopilot and FSD technologies, as well as advancements in the development of the same.

96.    In addition, the 2022 10-K contained substantively the same generic, boilerplate provision as referenced above, regarding the risk that Tesla "*may*" be subjected to product liability claims regarding, among other things, the Company's Autopilot and FSD technologies, while simultaneously downplaying that risk.

97.    Appended as an exhibit to the 2022 10-K were substantively the same SOX certifications as referenced above, signed by Defendants Musk and Kirkhorn.

98.    The statements referenced above were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants had significantly overstated the efficacy, viability, and safety of the Company's Autopilot and FSD technologies; (ii) contrary to Defendants' representations, Tesla's Autopilot and FSD technologies created a serious risk of accident and injury associated with the operation of Tesla vehicles; (iii) all the foregoing subjected Tesla to an increased risk of regulatory and governmental scrutiny and enforcement action, as well as reputational harm; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

99.   On February 16, 2023, media outlets reported that NHTSA had ordered a recall of nearly 363,000 Tesla vehicles equipped with the Company's FSD "Beta" software, stating that the software may allow the equipped vehicles to act "in an unlawful or unpredictable manner," increasing the risk of a crash. For example, an article published by *Bloomberg News* that day stated, in relevant part:

> Tesla Inc. is recalling 362,758 vehicles due to a crash risk associated with its so- called Full Self-Driving Beta software, according to US authorities.
>
> The system "may allow the vehicle to act unsafe around intersections," including traveling straight through an intersection from a turn lane and proceeding through steady-yellow traffic lights, according to a filing Thursday. Tesla is expected to fix the issue through an over-the-air software update by April 15, the US National Highway Traffic Safety Administration said.
>
> The system's errors "could increase the risk of a collision if the driver does not intervene," the NHTSA said.
>
> *          *          *
>
> The agency said it first notified Tesla on Jan. 25 that it had identified "potential concerns related to certain operational characteristics of FSD Beta in four specific roadway environments" and requested that the automaker file a recall.
>
> Tesla met with the agency multiple times in the following days. The company did not concur with the agency's analysis, but decided on Feb. 7 to move forward with the recall "out of an abundance of caution," according to NHTSA.

100.   On this news, Tesla's stock price fell $12.20 per share, or 5.69%, to close at $202.04 per share on February 16, 2023.

101.   Then, on February 18, 2023, media outlets reported that a Tesla vehicle had crashed into a fire truck that was responding to an earlier accident, killing the driver and injuring a passenger and four firefighters. News reports linked the crash with prior reports of Tesla vehicles crashing into stationary emergency vehicles as a consequence of poorly performing ADAS technologies, increasing market and public concerns regarding the Autopilot system in Tesla's vehicles. For example, an article published by *Reuters* that day stated, in relevant part:

> A Tesla . . . driver in California died early on Saturday after crashing into a fire truck on an interstate highway, the fire department said.

*U.S. regulators are investigating Tesla vehicles with the Autopilot driver assistance system over a string of crashes with parked emergency vehicles.*

Tesla did not immediately respond to Reuters requests for comment outside of business hours.

The Contra Costa County Fire Protection District Department said in a tweet that a passenger in the Tesla was taken to the hospital in critical condition. An official said four firefighters were released with minor injuries after evaluation.

The department said the truck had been blocking lanes of I-680 after a previous accident.

*The [NHTSA] said on Thursday its investigation, opened in 2021, "into Tesla's Autopilot and associated vehicle systems remains open and active." It is reviewing whether Tesla vehicles adequately ensure drivers are paying attention.*

The statement followed Tesla announcing a recall of more than 362,000 U.S. vehicles to update its Full Self-Driving Beta software after regulators raised concerns about the driver assistance system did not adequately adhere to traffic safety laws and could cause crashes.

(Emphases added).

102.   On this news, Tesla's stock price fell $10.94 per share, or 5.25%, to close at $197.37 per share on February 21, 2023, the next trading day.

103.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, the Company and its shareholders have been damaged.

## DAMAGES TO THE COMPANY

104.   Tesla has been, and will continue to be, severely damaged and injured by the Defendants' misconduct.   As a direct and proximate result of the Defendants' conduct, Tesla has been seriously harmed and will continue to be.   Such harm includes, but is not limited to:

a.   costs incurred in compensation and benefits paid to Defendants that breached their fiduciary duties and violated federal securities laws;

b.   substantial loss of market capital;

c.   costs already incurred and to be incurred defending the Related Securities Action and;

d.   any fines or other liability resulting from the Company's violations of federal law.

105.   In addition, Tesla's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired.  The credibility and motives of management are now in serious doubt.

106.   The wrongdoing complained of herein has irreparably damaged Tesla's corporate image and goodwill.  For at least the foreseeable future, Tesla will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Tesla's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

107.   Plaintiff brings this action derivatively in the right and for the benefit of Tesla to redress injuries suffered, and to be suffered, by Tesla as a direct result of violations of federal securities laws by the Defendants.  Tesla is named as a Nominal Defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

108.   The Board of Tesla, at the time this action was commenced, consisted of Defendants Musk, Denholm, Ehrenpreis, Mizuno, Murdoch, K-Musk, Wilson-Thompson, and Gebbia, a total of 8 individuals.

109.   Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Tesla Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

110.   Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

111.   Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

**Demand is Futile as to Defendant Musk Because of His**

**Principal Professional Occupation as the Company's CEO**

112.   Defendant Musk is the Company's CEO and has served in his position as CEO since 2008. Defendant Musk is also a member of the Board. In his role as CEO of the company, for the fiscal years of 2021, Defendant Musk received $23,760 in total compensation. The Company does not claim that Defendant Musk is an independent director and because his primary source of income and primary employment is his employment as CEO of Tesla and his professional reputation is inextricably bound to his role at Tesla, Defendant Musk is incapable of acting independently and demand is futile upon him.

**Demand is Futile as to the Members of the Audit Committee**

113.   Demand is futile as to Defendants Denholm, Mizuno, and Murdoch (the "Audit Committee Defendants") as members of the Audit Committee during the Relevant Period for their knowing failure to fulfill their responsibilities.

114.   The Board adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee.  The duties and purpose of the Audit Committee are set forth *supra*.

115.   Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

116.   The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information. In their capacity as members of the Audit Committee, the Audit Committee Defendants were charged with ensuring that these reports did not contain such materially misleading information.  By allowing documents to be filled with misleading information, the Audit Committee Defendants face a

1   sufficiently significant likelihood of liability so as to render them interested.  Accordingly, the Audit

2   Committee Defendants cannot adequately independently consider a demand.

3   **Demand is Futile as to the Members of the Disclosure Controls Committee**

4   117.   Demand is futile as to Defendants Denholm, Murdoch, and Wilson-Thompson (the

5   "Disclosure Controls Committee Defendants") as members of the Disclosure Controls Committee

6   during the Relevant Period for their knowing failure to fulfill their responsibilities.

7   118.   The Board adopted a Disclosure Controls Committee Charter, setting forth the

8   responsibilities of the Disclosure Controls Committee. The duties and purpose of the Disclosure

9   Controls Committee are set forth *supra*.

10   119.   Upon information and belief, in their capacity as members of the Disclosure Controls

11   Committee, the Disclosure Controls Committee Defendants were privy to specific information related

12   to the Company's business, operations, and prospects, which would reasonably put them on notice that

13   the statements set forth above in the Company's public filings were materially false and misleading

14   when made.

15   120.   The Company's public filing concerning the Company's business and prospects during

16   the Relevant Period contained materially misleading information and/or omitted material information.

17   In their capacity as members of the Disclosure Controls Committee, the Disclosure Controls

18   Defendants were charged with ensuring that these reports did not contain such materially misleading

19   information.  By allowing documents to be filled with misleading information, the Disclosure Controls

20   Committee Defendants face a sufficiently significant likelihood of liability so as to render them

21   interested.  Accordingly, the Disclosure Controls Committee Defendants cannot adequately

22   independently consider a demand.

23   **Demand is Futile as to the Director Defendants**

24   121.   Plaintiff has not made any demand on the Board to institute this action because a pre-suit

25   demand on the Company's Board would be futile, and therefore, excused.  This is because a majority

26   of the Board faces a substantial likelihood of liability as a result of their knowing toleration of the

27   above described false and misleading statements and omissions of material adverse facts, which render

28   them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

122.   Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

123.   Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period.  By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

124.   Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartiality to consider a demand to sue themselves in the present action.

## COUNT I

**Against the Securities Action Defendants for**

**Contribution Under Section 10(b) of the Exchange Act,**

**Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act**

125.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

126.   As a result of the conduct and events alleged above, Tesla has been named as a defendant in the Related Securities Action brought on behalf of Tesla shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

127.   Federal law provides Tesla with a cause of action against other alleged joint tortfeasors under Rule 10b-5.  In particular, under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U. S. 286, Tesla has a federal law right of contribution against joint tortfeasors under Rule 10b-5.  Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling Tesla to contribution against all joint tortfeasors under Rule 10b-5,

regardless of whether they have been named as defendants in the currently pending Related Securities Action, and sets forth specific rules regarding the determination of claims for such contribution.

128.   Accordingly, Plaintiff, on behalf of Tesla, hereby claims contribution against the Securities Action Defendants, each of whom has been named in the currently pending Related Securities Action as a joint tortfeasor with Tesla under Rule 10b-5, or if joined in such actions, would be liable for the same damages as Tesla.

129.   Tesla claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

**Allegations Regarding the Securities Action Defendants**

130.   Throughout the Relevant Period, the Securities Action Defendants caused the Company to issue false and misleading statements and/or omit material information in public statements and/or Company filings concerning the Company's business and financial prospects.  These statements were materially misleading to persons who purchased Tesla securities during the Relevant Period.

131.   The plaintiffs in the Related Securities Action allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing Tesla securities, and, as a result, suffered damages because value of their investments was distorted by the false and materially omissive statements, and they purchased such securities at such distorted prices.

132.   The damages suffered by said investors were caused by reason of the fact that (i) they were induced to purchase said securities by the false and misleading statements alleged herein, and (ii) the reveal of the true nature of the Company's business and prospects resulted in the decrease in price of its securities, causing the value of shareholders investments to drop.

133.   The plaintiffs in the Related Securities Action were unaware of the false and misleading nature of said statements and omissive disclosures.

134.   When the Securities Action Defendants signed off on or made the false statements and omissive disclosures detailed herein, they had actual knowledge that they were false and misleading. As alleged in detail herein, due to their positions as employees and/or directors of Tesla, the Securities Action Defendants were privy to information regarding the Company's business and financial

prospects and would have been aware that the statements made were in fact false and misleading when made.

135.   Accordingly, the Securities Action Defendants are liable for damages under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if Tesla were to be held liable in the Related Securities Action, the Securities Action Defendants would be liable to it for contribution.  Plaintiffs hereby derivatively claim such right of contribution on behalf of Tesla.

**Allegations Regarding the Securities Action Defendants as Control Persons**

136.   In acting as alleged above, the Securities Action Defendants were acting as authorized agents of Tesla in their roles as directors and/or employees.  Because of their positions of control and authority as senior officers and/or directors, the Securities Action Defendants were able to, and did, control the contents of the various reports, press releases and public filings disseminated by the Company throughout the Relevant Period, as alleged herein.

137.   The Securities Action Defendants were "controlling persons" of Tesla within the meaning of Section 20(a) of the Exchange Act, and, accordingly, the Securities Action Defendants could be held liable to the plaintiffs in the Related Securities Action.  Were the Company to be held liable in said Related Securities Action, the Securities Action Defendants would be liable to it for contribution.

138.   Plaintiff hereby derivatively claims such right of contribution on behalf of Tesla.

**COUNT II**

**Against the Individual Defendants for Breaches of Fiduciary Duty**

139.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

140.   The Individual Defendants owed and owe Tesla fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Tesla the highest obligation of good faith, loyalty, and due care.

141.   The Individual Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to Tesla shareholders materially misleading and inaccurate information through the Company's SEC filings throughout the

Relevant Period.  These actions could not have been a good faith exercise of prudent business judgment.

142.   During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Tesla to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to Tesla and its shareholders.  As a result, the Individual Defendants grossly mismanaged the Company.

143.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

144.   Plaintiff, on behalf of Tesla, has no adequate remedy at law.

**COUNT III**

**Against the Individual Defendants for Unjust Enrichment**

145.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

146.   By his wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Tesla.

147.   The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Tesla.

148.   Plaintiff, as a shareholder and representative of Tesla, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and breaches of fiduciary duty.

149.   Plaintiff, on behalf of Tesla, has no adequate remedy at law.

**COUNT IV**

**Against the Individual Defendants for Waste of Corporate Assets**

150.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

151.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

152.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things: (a) paying excessive compensation and bonuses to certain executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Related Securities Action.

153.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

154.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A.   Declaring that Plaintiff may maintain this action on behalf of Tesla and that Plaintiff is an adequate representative of the Company;

B.   Determining and awarding to Tesla the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C.   Directing Tesla and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Tesla and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

1)   a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

2)  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

D.  Determining and awarding to Tesla exemplary damages in an amount necessary to punish Defendants and to make an example of Defendants to the community according to proof at trial;

E.  Awarding Tesla restitution from Defendants, and each of them;

F.  Awarding Tesla Contribution from the Securities Action Defendants, and each of them;

G.  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.  Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:      April 13, 2023                          **REICH RADCLIFFE & HOOVER LLP**


By: /s/ Adam T. Hoover
Adam T. Hoover

**LIFSHITZ LAW PLLC**

Joshua M. Lifshitz

Attorneys for Plaintiff

**<u>VERIFICATION</u>**

I, Steve Schnipper hereby declare as follows:

  I am shareholder of TSLA and have continuously so owned the Company's common stock during the relevant period. I declare that I am the plaintiff named in the foregoing Shareholder Derivative Complaint ("Complaint"), and know the content thereof; that the pleading is true to my knowledge, except as to those matters stated on information and belief, and that as to such matters I believe to be true.  I declare under penalty of perjury that the foregoing is true and correct.

Executed on 04/05/2023

               Signature